IN THE SUPREME COURT OF TEXAS
 
════════════
No. 09-0520
════════════
 
In re Coy Reece, Relator
 
 
════════════════════════════════════════════════════
On Petition for Writ of Mandamus
════════════════════════════════════════════════════
 
 
            
Justice Willett, joined by 
Justice Johnson as to Part IV, dissenting.
                                                                                                

            
Intrepidity at the Alamo; entering the United States as the Republic of 
Texas; fifty-eight Texas-born recipients of the Medal of Honor; Bob Wills and 
George Strait; Nolan Ryan and Babe Didrikson Zaharias; five Super Bowl titles 
(sadly none this millennium); Dr Pepper and the “little creamery” in Brenham; 
deep-fried anything at the State Fair; a spirit of daring and rugged 
independence—the sources of Lone Star pride are innumerable.
            
Unfortunately, the juris-imprudent design of 
the Texas judiciary does not make the list. Today’s case is a byproduct of that 
recondite web, sparking a game of jurisdictional hot potato between us and our 
constitutional twin, the Court of Criminal Appeals. Truth be told—and this 
particular truth has been told repeatedly—the State’s entire Rube 
Goldberg-designed judicial “system” is beyond piecemeal repair; it should be 
scrapped and rebuilt top-to-bottom. That said, and however labyrinthine the 
jurisdictional maze often is, the answer in today’s case seems straightforward: 
This dispute belongs with our sister court. It arrived on our doorstep because 
of a simple yet pivotal misunderstanding: the Court of Criminal Appeals’ 
mistaken belief that we have unfettered habeas jurisdiction and are thus equally 
able to grant habeas relief.[1] We do not,[2] and the Court today is unified 9-0 on 
that point (though the Court does not explicitly mention our sister court’s 
misinterpretation). We part ways 7-2 on whether we should make lemonade out of 
jurisdictional lemons by wiring around our habeas limitation and relabeling the 
relief sought “mandamus.”
            
The mandamus remedy turns on two findings: legality and practicality.[3] On both scores, I would return this case 
to the court that conceded two years ago that it “does have the authority to act 
in this case.”[4] Statute and precedent strongly suggest we 
cannot hear this case, but even if we can, practical 
considerations advise we should not. Neither refusing nor resisting, the 
Court today yanks tighter a Gordian knot that should be cut clean through. I 
respectfully dissent, and, for good measure, exhort the Legislature to propose a 
judiciary worthy of Texas.
I. This Case Illustrates (Again) Our Abstruse 
Judicial “System.”
“An artificial and arbitrary system, as age creeps on, gets 
hardened arteries.”[5]
 
            
The history of Texas courts is indeed a sclerotic one. But all’s well 
that ends well, and even a helter-skelter judicial structure might be worth the 
strife if it still managed, despite itself, to produce efficiency. Ours 
hasn’t.
A. We Have Arrived Here Through Historical 
Happenstance.
            
Like many things of Texas lore, the story of our court system begins with 
its size. During the colonization of Texas, judicial power was vested in the 
“municipal alcalde, an elected official who held 
executive, legislative and judicial duties,”[6] and Stephen F. Austin was himself the 
court of last resort.[7] After winning our independence, “Texas 
began with a unified judiciary system,”[8] and both the Republic of Texas and the 
early State had a single high court with both civil and criminal jurisdiction.[9] From statehood through Reconstruction, 
every appeal from a trial court went directly to the state’s Supreme Court, 
which at varying times had three or five members.[10]
            
“Forty years and five constitutions later,”[11] and responding to this Court’s congested 
docket, the Constitution of 1876 created a three-judge court of appeals for 
criminal matters and limited this Court’s jurisdiction to civil matters.[12] The court of appeals, which despite its 
name was not an intermediate court, had final say in criminal appeals, and could 
also hear civil matters involving less than $1,000.[13] The flow of cases continued unabated, 
however, and in 1879, the Legislature fashioned another judicial Band-Aid with 
the creation of a Commission of Appeals.[14] But even doubling the number of 
commissioners provided scant docket relief, and in 1891 (just fifteen years 
after the Constitution was adopted), the citizens of Texas tried another 
approach, a massive overhaul that scrapped the entire Judiciary Article of the 
Constitution.[15] This kitchen-sink reform abolished the 
court of appeals and Commission of Appeals, gave criminal jurisdiction to a new 
Court of Criminal Appeals, and created three new intermediate courts of civil 
appeals[16] (in Galveston, Forth Worth, and 
Austin).[17] Our Court would maintain its civil-only 
docket and focus chiefly on resolving conflicts in the courts of 
appeals.[18]
            
The Legislature was also charged with the task of dividing the state into 
judicial districts, each with its own court of civil appeals.[19] In 1913, this Court’s jurisdiction grew 
to include all cases from the courts of civil appeals,[20] and in 1980, a constitutional 
amendment bestowed criminal jurisdiction on the renamed courts of 
appeal.[21] Efforts to create a separate body of 
criminal-only intermediate courts were defeated.[22] So while the two highest courts in the 
state maintain specialized dockets, the feeder courts beneath them do not.
            
Generally speaking, under our bifurcated structure, litigants file 
civil matters in the Supreme Court and criminal matters in the Court of Criminal 
Appeals. People frequently get misdirected, though—lawyers included—and the 
courts’ front offices regularly redirect lost litigants to the “other” high 
court. In fact, this Court’s clerk’s office has a stock letter it sends—every 
single day—to lost litigants, steering them to our sister court and noting that 
the Supreme Court “does not have jurisdiction over criminal cases” and “does not 
review the decisions of the Court of Criminal Appeals.”[23]
            
Our dual high courts are largely meant to be co-equals—constitutional 
twins. This is anomalous among court systems, even in the only other 
two-court state, Oklahoma. Like Texas, Oklahoma has a Supreme Court that hears 
civil appeals and a Court of Criminal Appeals that hears criminal 
appeals.[24] But 
there are two key differences. First, the Oklahoma Court of Criminal Appeals is 
“subject to the power of the Legislature to change or abolish.”[25] Second, the Oklahoma Supreme 
Court is truly supreme; if there is a jurisdictional clash, the Supreme Court 
“shall determine which court has jurisdiction and such determination shall be 
final.”[26] In other words, there are two states in 
the nation with two courts of last resort. But only one state—the Lone Star 
State—has a non-supreme Supreme Court.[27]
B. Our Fragmented Structure is Much Maligned, 
and Deservedly So.
            
The convoluted make-up of the Texas judiciary—“one of the most 
complex in the United States, if not the world”[28]—does not lack for critics, from the 
litigants who endure it, the lawyers who navigate it, and the judges who lead 
it. In 1991, this Court’s appointed Citizens’ Commission on the Texas Judicial 
System reached a stark but unsurprising conclusion: “Texas has no uniform 
judicial framework to guarantee the just, prompt and efficient disposition of a 
litigant’s complaint. . . . With the passage of time, the 
organization of the courts has become more, not less cumbersome.”[29] That critique mirrors one that same year 
from the Texas Research League (“TRL”), which former Chief Justice Phillips had 
asked to scrutinize our judicial structure and suggest concrete improvements. 
The system’s mind-numbing complexity led TRL to lament in May 1991 that the 
Texas judiciary was in “disarray” and “ill-equipped to meet the needs of the 
21st century,” adding, “Texas does not have a court system in the real sense of 
the word.”[30] Indeed, “assigning the appellation 
‘system’ to our state courts might require a long stretch of the 
imagination.”[31] Nothing has 
improved, and interestingly, the most strenuous critics, it seems, are those who 
know the system best: the judges.
            
First, trial courts. “Texas has some 
3,241 trial courts within its 268,580 square miles.”[32] The complexity at the lower-court level 
is dizzying, as the attached chart (meant to simplify things) 
illustrates.[33] In his 2007 State of the Judiciary 
address, Chief Justice Jefferson 
urged the Legislature to modernize our patchwork trial-court system, 
calling on lawmakers to start “examining whether Texans are best served by the 
current (and often redundant) complex system of county courts at law, district 
courts and statutory probate courts, or whether streamlining some of these 
courts may create a simpler system.”[34] Three members of this Court recently 
branded our jurisdictional mishmash “unimaginably abstruse,” a tangle that has 
“gone from elaborate to Byzantine.”[35] A former member of this Court politely 
called our system “the opposite of a coordinated judiciary.”[36] One former state appellate judge 
bemoaned our “maze of jurisdiction and procedure” that “[o]nly a puzzle-maker could appreciate.”[37]
            
In 1993, the Court-appointed Citizens’ Commission on the Texas Judicial 
System commented that “[n]o one person understands or can hope to understand all 
the nuances and intricacies of Texas’ thousands of trial courts.”[38] Yet another report bemoaned that 
“current judicial districts are so fundamentally unfair and so irrationally 
configured as to shock the conscience of all Texans who familiarize themselves 
with the present system.”[39] This 
long-derided irrationality persists.
            
As one might imagine, our bizarre structure has generated some fanciful 
factoids—practical problems and offbeat jurisdictional oddities that clog the 
everyday inner workings of our judiciary. Consider:
•                     
Texas has at least nine different types of trial courts, “although 
that number does not even hint at the complexities of the constitutional 
provisions and statutes that delineate jurisdiction of those courts.”[40] Whether a given 
trial court has jurisdiction is a five-step inquiry.[41]
                                          

•                     
As Chief Justice 
Jefferson has pointed out: “Some counties share a multi-county district 
court, while others have multiple districts within the county. And some counties 
are part of more than one district, creating a shifting target for litigants who 
may not know which court’s rules prevail. Overlapping geographical jurisdiction 
creates confusion for litigants and increases the risk of conflicting rulings in 
a single area.”[42]
 
•                     
At least one county court has no civil jurisdiction 
whatsoever.[43]
 
•                     
Only eight percent of Texas’s justices of the peace are lawyers, 
even though they can hear cases involving multimillion-dollar claims.[44]
 
•                     
A civil suit that would be tried before a twelve-person jury in 
district court would be tried before a six-person jury if filed in a county 
court.[45]
 
•                     
District court vacancies are filled by appointment by the 
Governor[46] but statutory county court vacancies are 
filled by appointment by the county commissioners, even though those courts 
frequently have jurisdiction over the same matters.[47]
 
•                     
Whether there is a minimum monetary limit on the State’s district 
court jurisdiction actually remains an open question.[48] While the 
Constitution has been amended to eliminate a monetary minimum, there is some 
argument that it is still implied.[49]
 
•                     
Generally, jurisdictional limits on statutory county courts range 
widely by county—from $500 to $100,000[5][0]—and some such courts have no monetary 
limits at all.[51]
 
•                     
“Appellate rights can vary depending on which court a case is 
filed in, even among trial courts with concurrent jurisdiction, and even when 
the same judge in the same courtroom presides over two distinct courts.”[52]
 
            
Second, intermediate appellate courts. Texas is the only state in the 
nation in which trial judges answer to more than one intermediate appellate 
court;[53] that is, no other state has overlapping 
appellate jurisdictions.[54] Fifteen counties are in overlapping 
districts.[55] This Court has lamented the “manifest” 
problems inherent in overlapping districts: “uncertainty from conflicting legal 
authority,” “the potential for unfair forum shopping,” and “jurisdictional 
conflicts.”[56] In fact, the two Houston-based courts of 
appeals have even reached polar-opposite outcomes on the same 
facts[57]—allowing three passengers in a car 
accident to sue but not the fourth.[58] The following year, in 2002, we exhorted 
the Legislature that “[n]o county should be in more than one appellate 
district.”[59] I suspect we will do so again next year 
when we issue our required plan to the Legislature on whether any appellate 
courts should be added, eliminated, consolidated, or reallocated.[60]
            
The Attorney General’s current chief legal counsel recently bemoaned 
problems inherent in our overlapping intermediate-court structure: “Much of the 
problem—and most of the opportunity for reform—lies in the antiquated structure 
of the lower courts”;[61] likewise, our appellate courts “are 
struggling to overcome a structure ill-suited to modern caseloads.”[62] Created to ease high-court docket 
congestion, our “heavily fractured intermediate court structure,” if anything, 
has created a system “more primed for generating conflicts” than any other state 
in the nation.[63]
            
Third, courts of last resort. Coy Reece’s 
case is but one more cautionary Texas tale. As it illustrates, our dichotomized 
system invites inter-court confusion, and as Texas history shows, inter-court 
clashes. The Citizens’ Commission report from 1993 noted that conflicts between 
the dual courts have arisen over the conclusivity of 
the courts of appeals’ factual determinations, the constitutionality of the 
“Pool Hall Law,” and whether journals of the House and Senate can be used to 
contradict an enrolled bill.[64]
            
In fact, members of the two courts have themselves sometimes highlighted 
the friction that occasionally befalls a bifurcated system. A Court of Criminal 
Appeals judge once lamented the split-system’s tendency to shuffle parties 
needlessly about as he sent an “appellant on his way to begin yet another search 
for the proper forum.”[65] In another case, three members stated 
that they were “concerned that this State’s bifurcated judicial process could 
sometimes generate conflicting decisions at the highest level on identical 
questions of law . . . . If 
there is a problem, it lies with the lines dividing the constitutional 
jurisdiction of this Court and the Texas Supreme Court.”[66] The Texas system’s decentralized nature 
has been blamed for a “lack of coordination”[67] that is apparent here. Even the Office 
of the Attorney General—“the law firm of Texas” itself—is not wholly immune from 
the jurisdictional confusion. In 1992, the Attorney General’s Office took the 
rare step of appealing a lower-court ruling striking down the State’s 
anti-sodomy law to both courts because, as the lead attorney explained, 
“We want to make sure we’re not locked out of an appeal. It was either file with 
both or roll the dice.”[68] The Court of Criminal Appeals declined 
jurisdiction,[6][9] and this Court eventually ruled that it 
too had no jurisdiction.[70] The (non)decision was roundly 
criticized. One might wonder, as did an editorial board, “What’s the point of 
having not one, but two final state appellate courts if neither of them has the 
authority to rule on the constitutionality of a Texas criminal statute?”[71] Lawyers ought not be forced to litigate “on a guess and a gamble.”[72]
            
Up north in Oklahoma, that Supreme Court could decide this jurisdictional 
quandary swiftly. Not so here, though one court-reform study, mindful of the 
potential for jurisdictional confusion, proposed a Sooner-like solution whereby 
“the supreme court should determine which court has jurisdiction, and those 
determinations should be final.”[73]
C. A Century of Pleas for Structural Reform Have 
Failed.
            
The urgency of sweeping judicial reorganization was “a perennial 
theme”[74] throughout the twentieth century. 
Earnest reformers like Roscoe Pound[75] and blue-ribbon studies galore urged a 
sweeping restructuring of our hodgepodge judiciary. Throughout the 1900s, “in 
virtually every decade of [the] century,”[76] there were regular calls in the 
Legislature, the academy, and the profession for structural reforms at every 
level, including high-court merger.[77] There have been periodic small-bore 
reforms, yet even those piecemeal tweaks were “inexorably tedious and 
protracted”;[78] ad hoc is the rule—evolutionary rather 
than revolutionary.
            
The 1970s were particularly reform-minded. The Judicial Section of the 
State Bar of Texas pushed for substantial changes to our judicial structure 
during the 1971 legislative session.[79] That same year, the Legislature proposed 
a constitutional amendment, eventually adopted by voters in 1972, directing the 
Legislature to form a Constitutional Revision Commission to “study the need for 
constitutional change” and then convene in 1974 as a constitutional 
convention.[80] Also that same year, in October 1971, 
then-Chief Justice Calvert formed the Chief Justice’s Task Force for Court 
Improvement to rewrite Article V, the Judiciary Article of the Texas 
Constitution. In September 1972 the Task Force proposed, among other things, 
simplifying the trial-court maze, investing the courts of civil appeals with 
criminal jurisdiction (which happily happened in 1980), reforming judicial 
selection, and merging our twin high courts.[81] The Calvert Task Force coincided with a 
court-reorganization report by the House Judiciary Committee, which in 1972 
called for extensive changes in the judicial branch.[82]
            
In early 1973, the thirty-seven members of the Texas Constitutional 
Revision Commission began nine months of study and public hearings, culminating 
in a proposed new state constitution.[83] (The Revision Commission was chaired by 
then-former Chief Justice Calvert, who had left the Court the previous 
October, one month after his Task Force unveiled its proposed Judiciary 
Article). Essentially, the Calvert-led Revision Commission adopted the 
recommendations of the Calvert-led Task Force.[84] Notably, though, the Revision 
Commission, unlike the Task Force, wrestled with modernizing the entire 
Texas Constitution, not just Article V. And the document it presented to the 
Legislature in November 1973 was the first comprehensive effort to draft a new 
constitution for Texas since the Constitutional Convention of 1875.[85]
            
The following January, the Legislature convened unicamerally in the House chamber as the Constitutional 
Convention of 1974. Like the Revision Commission, the Constitutional Convention 
favored a wholesale overhaul of the entire Constitution, and many of the 
proposed reforms, especially a right-to-work provision, provoked raucous 
debate.[86] The Convention dissolved seven months 
later, falling three votes shy of submitting a new constitution to Texas 
voters.[87] That October, the House Judiciary 
Committee submitted a report calling on the Legislature to submit to voters the 
revision of Article V that the 1974 Constitutional Convention 
considered.[88]
            
The Legislature reconvened in January 1975, and this time, acting as a 
regular legislature and not as a constitutional convention, it approved what 
became a package of eight separate amendments, including a new Article V, which 
resurrected the recommendations for a combined high court, courts of appeals 
with both civil and criminal jurisdiction, and substantial trial-court 
unification.[89] For the first time in a century, Texans 
had an opportunity to consider a revised constitution. It was not to be. As in 
the Constitutional Convention the previous year, fierce opposition arose over 
various non-judiciary proposals (like annual legislative sessions, a 
right-to-work provision, and taxation and education reforms) and each and every 
proposed revision was defeated, including the modernized Article V (which 
received more votes than any other amendment).[90]
            
A 1976 interim study of the House Judiciary Committee submitted fifteen 
piecemeal recommendations,[91] six of which the Legislature enacted 
(like the creation of the Office of Court Administration).[92] In 1979, then-Chief Justice Greenhill 
championed in his State of the Judiciary address the rifle-shot reform of giving 
criminal jurisdiction to the courts of civil appeals,[93] and voters agreed in 1980.[94]
            
The call for broader reforms persisted throughout the 1990s—from 
TRL,[95] to the Comptroller,[96] to the Court-appointed Citizens’ 
Commission.[97] In May 1991, TRL urged a totally new 
Judicial Article, saying our courts are so “fragmented” that “[t]he Texas court 
system really is not a system at all.”[98] In 1991, we 
directed an eighty-four-member Citizens’ Commission on the Texas Judicial System 
to “study and recommend any necessary or desirable improvements in the courts of 
Texas.”[99] Given our 
constitutional responsibility “for the efficient administration of the judicial 
branch,”[100] the Court invited common-sense reforms, 
predominantly those related to the “jurisdiction and title of the trial and 
appellate courts of Texas.”[101] Believing “a sound organizational and 
administrative structure is essential to a well-regarded judiciary,” the 
Commission proposed a system that simplified general-jurisdiction trial courts 
and unified our dual high courts, though the new Supreme Court would have “two 
divisions, civil and criminal, each with seven justices.”[102]
            
In the 1990s, the Citizens’ Commission proposals did draw support as part of broader efforts to streamline our ungainly 
constitution down to something approaching comprehensibility.[103] No such luck; the efforts sputtered. 
Our unwieldy constitution lives, including our crazy-quilt court system, a 
top-to-bottom mess. The push for modernization has continued apace in the 2000s. 
Many observers, including members of this Court,[10][4] have continued pushing for lower-court 
simplification, and other voices urge high-court merger as part of a broader 
restructuring.[105]
            
Against this bizarre background I turn to Reece’s petition for writ of 
habeas corpus. It determines the procedural posture that so interestingly 
animates this case, and channels the kinds of cases this Court can and cannot 
hear. The issue of jurisdiction—deciding to decide—may sound like a 
meta-interest floating in the jurisprudential ether, but its importance as a 
threshold issue cannot be overstated. The matter of to whom 
the courts are open—and for which claims—colors our bifurcated high-court 
system, and ultimately disposes of this case. Sections II and III 
discuss, respectively, the statutory and precedential evidence that suggests we 
are not permitted by law to hear this case. Section IV explains that even if we 
do maintain jurisdiction, it would be unwise to exercise it. The former is a 
matter of a legal directive, the latter a matter of judicial discretion, but 
both yield the same conclusion: There is no compelling case to hear this 
case.
II. The Clear Statutory Prohibition that Prevents this Court 
from Hearing this Case as a Habeas Petition Suggests it Cannot be Cleverly 
Restyled as Mandamus.
 
            
There is no argument that this Court is statutorily hamstrung when it 
comes to habeas jurisdiction. The Texas Constitution gives us the “power to 
issue writs of habeas corpus, as may be prescribed by law.”[106] That law is Section 22.002(e) of the 
Government Code, which limits such jurisdiction to times “when a person is 
restrained in his liberty by virtue of an order, process, or commitment issued 
by a court or judge on account of the violation of an order, judgment, or decree 
previously made, rendered, or entered by the court or judge in a civil 
case.”[107] Despite the jurisdictional thicket that 
has sprouted kudzu-like around us, the path out is rather linear.
A. There is No Debate that Habeas May Not Issue 
Here.
            
As applies here, this Court has the authority to issue a habeas writ only 
if Reece both seeks release from custody and appeals from an order of contempt 
based on a violation of an order, judgment, or decree “previously made” by the 
court or judge in a civil case.[108] Otherwise, we have no statutory 
authority to act: If the basis for contempt is not the violation of a 
previously issued order, we do not have jurisdiction to review a sentence 
of confinement via habeas corpus.[109] While Reece does seek release from 
custody, there is no argument—either by the Court,[110] the trial court below, or the very 
parties before us—that the contempt order here was based on such a violation. 
Therefore, this Court lacks power to issue habeas relief.
            
To say this is a rule grounded in statute and in precedent would be an 
understatement. This Court has been in the business of reviewing habeas 
petitions based on statutory language similar to Section 22.002(e) for more than 
100 years.[111] We have denied jurisdiction over habeas 
petitions not arising from the violation of a previously made order for just as 
long.[112] The Court of Criminal Appeals was, 
respectfully, incorrect when it stated that “[e]ffective 1981, Article 5, § 3(a) of the Texas Constitution 
was amended to give the Texas Supreme Court and the Justices thereof the 
authority to issue writs of habeas corpus.”[113] The amendments 
of 1980 (effective 1981) did no such thing. Instead, they rewrote the first 
paragraph of the section, but retained the language that “[t]he Supreme 
Court and the Justices thereof shall have power to issue writs of habeas 
corpus, as may be prescribed by law . . . .”[114] And here, law 
prescribes that habeas may not issue in this case.
B. There Should Be No Debate that Relabeling 
the Remedy “Mandamus” Cannot Circumvent this Rule.
            
The strength of this rule should be heeded as a sign—both from the Texas 
Legislature and our many decisions construing its enactments—that we are not 
meant to hear appeals from contempt cases where the basis for contempt is not 
the violation of a previously issued order, and therefore, we are not meant to 
ad-lib the means to arrive at the same forbidden end. It is undisputed that we 
cannot hear this case as a habeas petition. Why, then, should we be permitted to 
hear it under another name?
            
This statutory prohibition—the only legislatively mandated anchor in a 
sea of confused and overlapping jurisdiction—should and does provide a 
comprehensive sense of this case. By issuing mandamus when we are clearly not 
permitted to issue habeas, we do a disservice to the framework differentiating 
the two, as well as to the jurisdictional structure which (for better or worse) 
we are charged with upholding.
            
The Court contends “our constitutional and statutory grant of mandamus 
jurisdiction is broad,” and not limited in the way I suggest here, explaining 
that “this Court possesses general original jurisdiction to issue writs 
of mandamus.”[115] But the Court is forced to qualify that 
proposition by citing to the Texas Constitution: “See Tex. Const. art. V, § 
3(a) (granting the Court power to issue writs of mandamus as specified by the 
Legislature).”[116] The exception 
nullifies the rule. Our mandamus jurisdiction is undoubtedly circumscribed by 
law. Where the Legislature has spoken clearly and removed the kind of case now 
before us from our jurisdiction, it is disingenuous to circumvent the rule by 
renaming the remedy.
III. Precedent Further Indicates this Court 
Cannot Issue Mandamus.
            
The statutory prohibition against habeas is but one reason to dismiss the 
case. There are others grounded in our mandamus (rather than habeas) 
jurisprudence. We have at least suggested—if not stated plainly—that the habeas 
prohibition precludes our ability to hear a case like this, explaining that 
“[o]ur original habeas corpus jurisdiction is limited 
thereby to cases in which a person has been confined for violating an order, 
judgment or decree in a civil cause, and we are 
without power to inquire into the legality of restraint imposed for some other 
reason.”[117]
A. Our Deramus 
Decision Demonstrates—Rather Than Disproves—that Habeas is Inappropriate Here.
            
Both Reece and the Court[118] rely heavily upon one sentence in Deramus v. Thornton, in which we preserved the 
possibility that there might be contempt-related situations where mandamus, not 
habeas, would be the proper remedy: “We are not to be understood as saying, 
however, that there may not arise conditions involved in contempt matters where 
the writ of habeas corpus would not be adequate and where mandamus would be the 
proper remedy.”[119] The cautious words of wise jurists 
intent on protecting a hypothetical situation, however, should not be read to 
apply to and permit any series of facts that follow.
            
Deramus was held in contempt for violating an 
injunction. He sought a writ of mandamus ordering his trial judge to vacate the 
contempt judgment and dismiss the contempt proceedings. There, as here, we noted 
that the usual avenue for such a situation was habeas, explaining: “Had the 
District Judge not suspended the judgment of contempt the normal course would 
have followed, and the remedy adopted by the relator 
could necessarily have been an application for a writ of habeas 
corpus.”[120] Contrary to Reece’s urgings, in Deramus we noted that mandamus was not proper, 
buttressed in large part by the reasoning that “[w]e have uniformly held in this 
State . . . that the validity of a contempt judgment can be 
attacked only collaterally and that by way of habeas corpus.”[121] Even when we noted that this question 
was arguably a matter of policy—a view that seems to pervade the Court’s looser 
approach to the issue—we still remained “reluctant to depart from a judicial 
path so well landmarked, especially so since the claimed inadequacy of habeas 
corpus . . . [was] one common to 
all cases where escape is sought from the penalties of a contempt 
judgment.”[122] We went on to 
explain that “[t]his in itself, we think, is sufficient justification for our 
refusal of this application. To do otherwise would completely change the 
procedure long followed in this State and allow in every case an attack on the 
order of contempt by way of mandamus.”[123]
            
Reece has not violated a previously issued order, meaning this Court may 
not issue habeas. If the Court in Deramus 
found that habeas—not mandamus—was appropriate where contempt was the result 
of the violation of a previously made order, then the Court should find here 
that neither habeas—nor mandamus—is proper where there is no such violation. The 
dissent in Deramus acknowledged that 
habeas was the usual remedy in cases where a relator 
seeks a release from confinement, but maintained the view that the import of the 
cases suggested a different principle: “[W]here a judge, as in the instant case, 
has determined to commit and fine a relator on a void 
contempt judgment, this court has the power to issue writs of mandamus and 
prohibition to prevent the enforcement of a void act.”[124] It is unclear why the Court has 
essentially taken up the Deramus dissent 
without explicitly overruling Deramus.
            
In sum, what was true in Deramus 
remains true today: Granting mandamus “would completely change the procedure 
long followed in this State and allow in every case an attack on the order of 
contempt by way of mandamus.”[125] Deramus imagined scenarios in which the 
inadequacy of habeas would render mandamus the proper route. But Deramus itself demonstrates that this is not 
such a scenario.
B. In re Long Indicates Mandamus 
Specifically May Not Issue Here, Where Contempt Sanctions Involve 
Confinement.
            
In re Long[126] reinforces this conclusion. There we 
held mandamus would be proper in the review of contempt sanctions not involving 
confinement.[127] But because 
Reece challenges a criminal contempt action involving confinement, not based 
upon a previously issued order, In re Long is not directly controlling. 
Therefore, Reece fits into neither category. The Court’s assertion that because 
we have “declined to read the limitations in our habeas statute as a legislative 
prohibition against our exercise of mandamus jurisdiction” in fine-only cases, 
we can rightly “decline to do so here as well”[128] is a non sequitur. Reece was confined, 
so cases about non-confined persons cannot support the leap made by the Court 
today. There is simply no precedent establishing that mandamus is the 
appropriate remedy in this case.
            
In fact, quite the opposite is true. It can be inferred from In re 
Long that contempt sanctions that do involve confinement may not 
be reviewed through mandamus—otherwise, the distinction that case makes 
would be meaningless. We have applied this kind of logic to the habeas cases 
discussed earlier, in which we reasoned from the statute permitting 
issuance of the habeas writ where there is a violation of a previous 
court order that we were prohibited from issuing the writ where there was 
no such order. It makes sense to do the same here. Under a simple 
corollary of the In re Long rule, we are prohibited from issuing mandamus 
because Reece was subject to contempt sanctions that involved confinement. Even 
foregoing this inference as the Court would, however, it is clear that mandamus 
has never been permitted where there was no violation of an order and 
confinement was involved.
C. The Court Misconstrues the Mandamus 
Remedy.
            
The Court’s defense of its decision is based largely on four contentions: 
(1) mandamus is generally flexible; (2) no law announces that habeas is the 
exclusive remedy; (3) mandamus has often been used to “gap-fill” where there is 
no remedy; and (4) our sister court tends to defer to us on matters such as 
these. The first two stem from a more general view about the mandamus and habeas 
remedies, respectively. The second two are rooted in case law. I address each in 
turn.
            
First, it is true, as the Court points out, that mandamus is available to 
review rulings in “exceptional cases,” and that “rigid rules . . . are 
necessarily inconsistent with the flexibility that is the remedy’s principal 
virtue.”[129] But we have regularly deferred to the 
Legislature’s determinations of when mandamus is appropriate.[130] And the remedy has been largely used in 
obviously civil cases with no criminal element, and generally has not been used 
to trump other, independent limitations that work to bar the mandamus 
remedy.[131] This case is distinguishable on both 
counts: It presents an underlying civil case with a criminal penalty and 
is independently limited by precedent that confines the mandamus remedy when it 
comes to criminal contempt.
            
Consider, as an illustration, Betts v. Johnson.[132] There, the Court determined that an 
independent statutory limitation prevented it from issuing mandamus, and 
consequently overruled a motion to file a mandamus petition.[133] The statutory 
limitation was an article that permitted the Court to issue mandamus against an 
“officer of the state government.”[134] But since the writ applied for was 
against a board of officers, not against an officer, the Court 
reasoned that it could not issue mandamus.[135] The text of 
the statute prevented it from doing so. As recently as 2001, some justices of 
this Court refused mandamus on the same logic—not as a matter of practicality, 
but instead as a matter of legality.[136]
            
Similarly, we have determined mandamus may not issue to controvert a 
prior injunction[137] or to compel an officer to act outside 
the bounds of the law.[138] In both instances, the existence of law 
that would conflict with the mandamus remedy functions as an independent 
limitation upon it. We have also found ourselves powerless to issue mandamus 
where a collection of statutes suggested we lacked jurisdiction to hear the case 
in the first place.[139] While this is, 
to be sure, different from a prohibition specifically against mandamus, it still 
reinforces the general rule that independent statutory limitations channel the 
mandamus power.
            
Second, it is also true that no statutory or constitutional provision 
states that habeas is the only vehicle in this circumstance, and this Court has 
previously granted mandamus relief in quasi-criminal cases. The first point is a 
cat’s game, in which neither side wins: While there may not be a provision 
limiting the possibilities in this case to habeas, there is certainly not 
one explicitly permitting mandamus. To the contrary, In re Long at 
least suggests that mandamus is inappropriate where confinement is 
involved.[140] This and the fact that there is a 
statutory provision in Section 22.002(e) specifically limiting this 
Court’s habeas jurisdiction to certain instances—none of which are presented 
here—are at least two thumbs on the scale for the view that this Court lacks 
jurisdiction in this instance. As to the second point, having granted mandamus 
relief in other quasi-criminal cases does not make it appropriate here. Neither 
party seems to be able to point to a case where this Court granted mandamus on 
facts such as these, and in the teeth of an independent statute and precedent 
circumscribing our ability to do so.
            
Third, according to the Court, many cases support the view that mandamus 
is a statutory “gap-filler” that may issue here. But in none of these 
cases did an independent statutory prohibition suggest that mandamus was 
inappropriate as it does here. Instead, we simply fashioned a remedy because 
there was a lack of available alternatives. In other words, we are not claiming 
that express statutory permission is required to issue mandamus; we are 
simply asking that the Court refrain from issuing mandamus where there seems to 
be an express statutory prohibition against doing so.
            
Contrary to the Court’s understanding of my position, I do not believe 
that “if a statute grants jurisdiction in only a limited circumstance, it must 
follow that we are forbidden from exercising our mandamus jurisdiction in a 
situation falling outside the parameters of that limitation.”[141] We have 
certainly gap-filled properly in the past. This case is distinguishable because 
there is no gap (the Court of Criminal Appeals can still act, as Reece’s motion 
for rehearing remains pending there) and because there is statutory evidence not 
only that our jurisdiction is limited, but also that our jurisdiction is 
explicitly prohibited in this context.
            
“Gap-filling” is just that—a decision to act when there is no other 
avenue open to the parties. Today the Court does something more akin to 
“needle-threading” than “gap-filling.” It attempts to gap-fill where there is 
not clearly a gap—where there is, instead, a law.
            
For this reason, the Court’s citations to various arbitration cases are 
off-point. In Jack B. Anglin Co. v. 
Tipps,[142] the Court determined that mandamus was 
appropriate to review a trial court’s denial of a motion to compel arbitration 
under the Federal Arbitration Act (“FAA”).[143] But because of an independent statutory 
limitation—Texas procedural rules—those claiming a right to arbitration under 
the Texas Arbitration Act (“TAA”) and alternatively the FAA were required to 
file both an interlocutory appeal under the TAA and a writ of mandamus under the 
FAA.[144] Was this dual requirement a model of 
efficiency? Clearly not. But the Court recognized 
then—as it should realize now—that the form of the remedy was circumscribed by 
legislative mandate.[145] We reaffirmed 
that principle in the next case, too.[146]
            
We gap-filled because without the mandamus remedy the essence of the 
appeal would vanish, and the arbitration-seeker would be left without the very 
thing for which he contracted ex ante.[147] But we did not 
ignore law suggesting or stating we could not do so. Here, there is a 
wealth of law tending to show the mandamus remedy is not permitted. There is not 
a gaping hole that suggests oversight, but a narrow cranny that suggests 
deliberation. In other words, despite the Court’s argument, a “specific 
allowance for interlocutory appeal under the TAA in the absence of a law 
allowing for the same under the FAA”[148] is not the same as the presence of an 
independent statute explicitly suggesting interlocutory appeal is not allowed 
under the FAA. I doubt we would have permitted mandamus if there had been 
such a limitation.
            
This Court has similarly stepped in[149] where the Court of Criminal Appeals 
could not issue mandamus except as necessary to protect its own 
judgments.[150] This line of cases only reinforces my 
own view. We have granted mandamus where the Court of Criminal Appeals was 
constitutionally prohibited from doing so. We should not short-circuit the Court 
of Criminal Appeals from issuing habeas where we are statutorily prohibited from 
doing so.
            
It is also worth noting that the Legislature eventually intervened to 
fill in the “gap” for each of these cases.[151] That pattern only demonstrates that if 
the Legislature determines that the failure to give our Court jurisdiction over 
cases such as these was mere oversight, it knows well how to correct the 
error. Unless and until it does so, however, it makes little sense to take the 
lid off this jurisdictional can of worms, particularly when the can belongs to 
another.
            
Fourth and finally, the Court claims that the Court of Criminal Appeals 
has “preferred to defer” to this Court where contempt proceedings arise from 
civil cases. In support, it points to a case in which the Court of Criminal 
Appeals, after doing so, was forced to take the case back after a Supreme Court 
justice explained that this Court did not have jurisdiction.[152] That example should be followed today. 
The essence of this question is not in how often the Court of Criminal Appeals 
may err in attempting to pass a case like this to us, but in how often we have 
erred in accepting it. That we have never done.
            
Were we the Oklahoma Supreme Court, sorting out jurisdictional spats like 
this one by simply taking the case might be a more tenable position. But in Texas, it is the Legislature that designs 
and divvies up the dockets. And the Legislature has not given us the authority 
to hear this case—whether we call it habeas or mandamus.
D. The Court’s Reliance on Legislative History 
is Both Unnecessary and Unwise.
            
My skepticism of legislative history is well known, and well informed. It 
is a wariness borne of many years participating in the legislative process at 
both the state and federal levels, and confirmed by six years on the bench, 
where I see firsthand the perils of “embarking on a scavenger hunt for extratextual clues prone to contrivance.”[153] Any imagined 
gains from rummaging around in legislative minutiae, particularly absent any 
textual ambiguity, are more than dwarfed by multiple realities.
            
One such reality, unfortunate but also undeniable, is that legislative 
history is prone to manipulation (by lawyers, judges, and legislators alike) and 
often cited inaccurately, selectively and misleadingly. More fundamentally, the 
statute alone is what constitutes the Legislature’s collective will, and 
isolated snippets along the way lack the authoritative imprimatur of a 
Legislature that, we must presume, intended precisely what it enacted.
            
That said, one need not necessarily subscribe to 
this view to find the Court’s reliance on legislative history unsettling. For 
this case demonstrates yet another disadvantage to reading through the 
often-distorting lens of legislative history: It is really no aid at all.
            
The Court attempts to guess at what the Legislature of 1905 could have 
meant. The Court’s determination to wrestle with the ghost of Section 22.002(e) 
reveals, perhaps not surprisingly, that wrestling with ghosts is unsatisfying. 
After reading the House Judiciary Committee’s report on Senate Bill 36, the 
Court can only suggest that “perhaps [the Legislature] simply did 
not envision contempt in civil cases extending beyond [a contemnor’s violation 
of a court order], and so crafted this Court’s habeas jurisdiction 
accordingly.”[154] It can only note that the Court of 
Criminal Appeals has “suggested the same purpose.”[155]
            
That shaky assumption is the basis for the Court’s assertion that Reece’s 
case has “fall[en] inside the statutory loophole 
created by the particular division of habeas jurisdiction between the Court of 
Criminal Appeals and this Court.”[156] This is a 
loophole, of course, but only if one looks beyond the text of the statute—and 
not clearly even then. As another matter, “loopholes” are usually passageways 
through which unaddressed matters threaten to escape. Here, the text of Section 
22.002(e) limits habeas jurisdiction to exceedingly specific instances with the 
kind of precision that suggests the Legislature was drawing lines, not holes. If 
it wasn’t, then the Legislature remains free to clarify matters—especially in a 
case that springs from a judicial maze that lawmakers are best positioned to 
simplify.
IV. Granting Relief Poses Few Practical Benefits 
and Many Potential Practical Burdens.
            
Even if we can issue mandamus here, it is doubly clear that we 
should not. Even if it is legal, it is certainly impractical. Most 
peculiar about the Court’s decision to accept this appeal is the lack of any 
compelling practical reason to do so. The Court of Criminal Appeals itself 
acknowledged two years ago—before the case even arrived on our doorstep—that it 
has jurisdiction to hear the case.[157] If we dismiss, Reece will return to our 
sister court, where a motion for reconsideration remains pending—presumably 
awaiting our action. This renders untrue the Court’s statement that Reece has 
“no other procedure to challenge his confinement in our state courts”[158] and “no adequate remedy by 
appeal.”[159] The Court of Criminal Appeals has not 
refused to act; it has instead deferred final action until we act 
first.[160] I agree that “mandamus is a proper 
vehicle for this Court to correct blatant injustice that otherwise would elude 
review by the appellate courts,”[161] but that scenario simply does not exist 
here. As discussed above, the Court has utilized mandamus as a flexible remedy 
only where all other meaningful roads were blocked. If adequate appellate relief 
is available elsewhere, mandamus should not be used as judicial duct tape to 
cover “gaps” that simply do not exist. Where our sister court has conceded its 
own authority to act, we should be doubly disinclined to intervene.
A. Hearing Reece’s Case Implies a Lack of Equal 
Sisterhood with Our Supposed Sister Court.
            
If the instant case offers no reason to seize jurisdiction, the specter 
of future cases more strongly militates against our doing so. Hearing the case 
implies that the Supreme Court and the Court of Criminal Appeals are not 
co-equals. Accepting mandamus jurisdiction when the Court of Criminal Appeals 
has exclusive habeas jurisdiction over these types of contempt orders would 
violate the mandated separation with that court. It would evince more respect 
for an institution we call our equal, and those who created it, to allow it to 
hear its rightful docket than to encroach pointlessly upon it.
B. Hearing Reece’s Case Will Disorient Deciders, 
Confusing the Two High Courts and Courts of Appeals Alike.
            
Similarly, this case leaves open the question of whether and when a 
petitioner may seek review in both courts, and in what order. Such confusion 
could lead to an unnecessarily increased docket in either court, or at least 
wasted resources spent shuffling cases between the two systems (or discussing 
whether to do the shuffle in the first place). While the Court seems concerned 
that dismissing Reece’s case would constitute “a potential waste of judicial and 
litigant resources as the case travels between [both courts], with neither court 
exercising jurisdiction to consider the merits of Reece’s petition,”[162] that small, one-time shuffle will save 
us far more than it will cost. Ignoring the reality that our jurisdiction is 
limited will only make the ping pong match longer, and with more balls in the 
air.
            
The confusion caused in hearing this case will affect both litigants and 
the courts of appeals below that have understood and applied for years the rule 
that today the Court contravenes. The court of appeals in the instant case 
certainly believed it was following that rule when it dismissed Reece’s 
habeas petition for want of jurisdiction. It would be strange to tell those 
courts that a relator need only style his petition as 
mandamus to merit jurisdiction, especially when—as the Court 
acknowledges[163]—those courts have been operating under 
the assumption that mandamus was the only proper remedy.[164] Even Reece himself assumed this was the 
rule, as indicated by his decision to file “a motion for reconsideration in the 
Court of Criminal Appeals, explaining that this Court lacks habeas jurisdiction 
because the contempt order does not emanate from a violation of an order, 
judgment, or decree.”[165]
            
Further, this issue is before us largely because of the Court of Criminal 
Appeals’ mistaken view that this Court has habeas jurisdiction.[166] Making it a policy to grant cases that 
arise out of error instead of correcting the error will make neither our court 
nor our sister court as careful or as diligent in reviewing cases as we ought to 
be; it will only encourage punting cases—likely, the most difficult cases 
deserving of the most attention—back and forth between us. Reece claims that 
these are “unique circumstances” warranting mandamus as a matter of policy; but, 
contradictorily, Reece also warns that “the next case might involve a party to a 
civil case sentenced to six months in jail for contempt.” It certainly might. 
But that would be a matter for the Court of Criminal Appeals.
C. Hearing Reece’s Case May Manufacture 
Manipulation.
            
A lack of jurisdictional clarity threatens to encourage forum shopping. 
An astute attorney may determine that his client stands to receive a more 
favorable ruling at one court rather than the other, and arrange 
jurisdiction-manipulative arguments accordingly. After this case, for example, 
petitioners seeking an audience with the Supreme Court would be advised to style 
their petitions as mandamus; with the Court of Criminal Appeals, habeas.
D. Hearing Reece’s Case Draws a Blurry, Rather than Bright-Line, Rule.
            
Finally, the Court’s suggestion that today’s decision draws helpful lines 
of clarity between the civil and the criminal is unpersuasive. Today the Court 
may ostensibly limit itself by allowing this Court to grant mandamus in 
“situations where the underlying dispute is civil in nature, and the Court of 
Criminal Appeals declines to exercise its habeas jurisdiction.”[167] This has the semblance of a bright-line 
rule—we hear appeals arising from underlying civil matters, and the Court of 
Criminal Appeals from underlying criminal matters. But that is misleadingly 
simplistic, and contravenes prior precedent in which we explained that case 
categorization does not dispose of this issue.
            
In other words, it is still true that “[u]nder 
the provisions of the Texas Constitution and the pertinent Texas statutes 
relating to the original jurisdiction of this Court and the Court of Criminal 
Appeals, the circumstance that the cause out of which a restraint of a person’s 
liberty arises may be classified as a civil case, is not sufficient to vest this 
Court with habeas corpus jurisdiction.”[168] Further, hearing this case, and perhaps 
future cases like it, may force us to handle appeals from civil cases with 
criminal penalties, and force us at least in part to take on quasi-criminal 
matters. An unnecessary, duplicative upsurge in this Court’s docket is alarming 
enough on its own; but one comprised of quasi-criminal cases when there is a 
separate court designated for criminal matters is even more insupportable.
            
It is easy to draw a line based upon the nature of the underlying case, 
but this case alone demonstrates that the line is somewhat meaningless. Even the 
Court acknowledges that “the distinction between criminal and civil contempt 
does not turn on whether the underlying litigation is civil or criminal, 
but rather on the nature of the court’s punishment.”[169] The instant 
case, then, demonstrates that the cases—like the courts that hear them—are not 
always cleanly bifurcated. Here, the Court finds constructive criminal contempt 
even though it was imposed in a civil trial and not for the violation of a court 
order.[170]
            
The world is not nearly as tidy as the approach the Court has designed 
for it. In those blurry instances, it seems best to follow precedent. 
And a bright-line rule is particularly without its usual benefits where it 
comes at the expense of precedent that prohibits such a rule. “[W]e are seldom 
presented with the opportunity to give a jurisdictional statute a reasonable 
construction that results in more uniformity and simplicity (even if only 
slightly more), and given that opportunity in this case, I would seize 
it.”[171] The 
simplest—and most defensible—approach is not to attempt to create a bright-line 
rule but to refrain from hearing the case whatsoever. The brightest line is the 
one drawn between these two courts. After all, the Court of Criminal Appeals has 
called its original jurisdiction to issue writs of habeas corpus 
“unlimited.”[172]
V. Conclusion
            
No amount of head-tilting and eye-squinting can manufacture jurisdiction 
where there is none. Where mandamus relief would mirror the effect of a 
statutorily prohibited habeas writ, we should not hear the case. We should be 
particularly hesitant where our own mandamus jurisprudence precludes such 
relief. We should be triply wary where our sister court concedes it “does have 
the authority to act in this case.”[173]
            
I understand the Court’s commendable desire to correct an erroneous 
trial-court ruling, but where our labyrinthine judicial structure curbs our 
ability to hear certain cases, we must obey that limitation. This is not a case 
where either—or neither—high court has jurisdiction. This case belongs at the 
Court of Criminal Appeals, and that court is apparently awaiting our decision 
before ruling on Reece’s motion for rehearing.
            
It makes little sense for us to expand, without clear delineations, our 
own jurisdiction where our sister high court has already declared it has the 
power to take action. By inventing jurisdiction without practical or legal 
reasons for doing so, the Court today further muddles the two-court system in 
which we find ourselves. We may have inherited a jurisdictional house of cards, 
but it is imprudent to build more intricate towers upon it.
            
I would dismiss this petition, and in doing so urge my own: The fastest 
growing state in the nation requires a modernized top-to-bottom judicial 
structure fit for the twenty-first century and worthy of our great State. At the 
very least (and it grieves me to use these six words) Texas should be 
more like Oklahoma, where one high court is truly supreme and empowered to 
decide jurisdictional squabbles inherent in a bifurcated scheme. I respectfully 
dissent.
 
______________________________
Don R. Willett
                                                                                                
Justice
 
 
OPINION DELIVERED: May 27, 2011









[1] See In re Reece, No. 
WR-72,199-02, slip op. at 2 (Tex. Crim. App. June 29, 2009) (per curiam) (not designated for publication) (“Although this 
Court does have the authority to act in this case pursuant to Article 5, 
§ 5, of the Texas Constitution, we decline to do so. Effective 1981, 
Article 5, § 3(a) of the Texas Constitution was amended to give the Texas 
Supreme Court and the Justices thereof the authority to issue writs of habeas 
corpus.”). The Court of Criminal Appeals also offers the civil/criminal 
distinction as a basis for deference, id., an 
issue I address below. See infra IV.D. Even so, it is difficult to 
imagine our sister court lateraling to us had it 
realized we lack habeas jurisdiction to hear in this case.

[2] 
See 
Tex. Const. art. V, § 
3(a) (limiting the habeas jurisdiction of the Texas Supreme 
Court).

[3] 
Though it is discussed explicitly throughout this 
opinion, the legality prong has often been implicit: As a general rule, the 
Legislature determines our jurisdiction. See Tex. Gov’t Code § 22.001(a). This 
principle applies no less strongly to the issuance of mandamus. The practicality 
prong—namely, that the requesting party must show it has “no adequate remedy by 
appeal”—has received more judicial attention. See, e.g., In re 
Prudential Ins. Co. of America, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. 
proceeding) (“The operative word, ‘adequate’, has no comprehensive definition; 
it is simply a proxy for the careful balance of jurisprudential considerations 
that determine when appellate courts will use original mandamus proceedings to 
review the actions of lower courts.”).

[4] 
In re Reece, No. WR-72,199-02, at 2 (“Although this Court does have 
the authority to act in this case pursuant to Article 5, § 5, of the Texas 
Constitution, we decline to do so.”).

[5] 
Rhodes S. Baker, The Bar Association’s Legislative Program—Judicial 
Control of Procedure, 2 Tex. L. 
Rev. 422, 429–30 (1924).

[6] 
Adrienne Sonder, Tarlton Law Library, Jamail Center 
for Legal Research, Timeline of the Texas Supreme Court and Court of Criminal 
Appeals (Nov. 2006), http://tarlton.law.utexas.edu/justices/timeline.html 
[hereinafter “Sonder, 
Timeline”].

[7] 
Texas Research League, 
Texas Courts: Report One, The Texas Judiciary: A Structural-Functional 
Overview, at xiii and 2 (1990) (citation 
omitted) [hereinafter “Texas Research 
League, Texas Courts: Report I”].

[8] 
Joe R. Greenhill, The Constitutional Amendment 
Giving Criminal Jurisdiction to the Texas Courts of Civil Appeals and 
Recognizing the Inherent Power of the Texas Supreme Court, 33 Tex. Tech L. Rev. 377, 378 (2002) 
(citation omitted) [hereinafter “Greenhill, The Constitutional 
Amendment”].

[9] Id.

[10] James T. 
Worthen, The Organizational & Structural 
Development of Intermediate Appellate Courts in Texas, 1892–2003, 46 
S. Tex. L. Rev. 33, 34 (2004) 
(citation omitted) [hereinafter “Worthen, The Organizational & Structural 
Development”]; Leila Clark Wynn, A History of Civil Courts in Texas, 
60 Sw. Hist. Q. 1, 4–5 
(1956).

[11] Texas Research League, Texas 
Courts: Report I, 
at xiii.

[12] Id. This 
was itself “the sixth judicial structure implemented in Texas within 40 years.” 
H. Comm. on the 
Judiciary, A Proposal for the Comprehensive Revision of Article V, 63rd 
Leg., R.S., at 3 (1974) [hereinafter “H. 
Comm. on the Judiciary, A Proposal”].

[13] Worthen, 
The Organizational & Structural Development, at 34 (citation 
omitted).

[14] Id. (citation 
omitted).

[15] Id. 
at 34–35 (citation 
omitted).

[16] Tex. Const. 
art. V, § 
4–5 (amended 1891).

[17] Second Court 
of Appeals, History and Jurisdiction, Texas Courts Online, 
http://www.2ndcoa.courts.
state.tx.us/court/history.asp (last 
updated Sept. 2, 2008).

[18] Tex. Const. 
art. V 
§ 3 (amended 1891).

[19] Id. § 
6.

[20] Act of March 
26, 1913, 33rd Leg., R.S., ch. 55, § 1, 1913 Tex. Gen. 
Laws 107. Incidentally, the Commission of Appeals, created in 1879 and 
eliminated in 1891, was reestablished in 1918 to ease this Court’s still-crowded 
docket, and in 1925, the Legislature created a two-person Commission of Appeals 
to help the Court of Criminal Appeals. These two commissioners were folded into 
the formal Court of Criminal Appeals when its membership grew from three to five 
in 1966. But just three years later, in 1969, the Commission was reestablished 
to help the Court of Criminal Appeals meet its workload. See Sonder, Timeline.

[21] See 
Worthen, The Organizational & 
Structural Development, at 39–40 (citations omitted).

[22] See 
id. at 40–41 
(citations omitted).

[23] Letter from 
Blake A. Hawthorne, Clerk of the Supreme Court of Texas (May 9, 2011) (citing 
Tex. Gov’t Code §§ 22.001–.002) (on file in the clerk’s office 
of the Supreme Court of Texas).

[24] The Supreme 
Court of the State of Oklahoma, Bringing a case before the Appellate Courts, 
http://www.oscn.net./oscn/schome/appelcase.htm (last visited Mar. 28, 2011). 
There are 52 state courts of last resort (50 state courts, the criminal courts 
in Texas and Oklahoma), plus the District of Columbia Court of Appeals). 
National Center for State Courts, Many states outpace U.S. Supreme Court on 
gender diversity (Apr. 21, 2010), 
http://www.ncsc.org/newsroom/backgrounder/2010/gender-diversity.aspx.

 
[25] Okla. Const. 
art. VII, 
§ 1.

[26] Id. § 4.

[27] Nearly one 
hundred years ago, the Alabama Supreme Court explained why this might be a bad 
idea:
 
There must be in every state a court capable of 
exercising ultimate judicial power. In this state that is the Supreme Court. If 
it were otherwise, there would be no organ of government capable of 
authoritatively settling judicial questions; and there must be such an organ 
there can be no doubt, for the judicial department is an independent one, and 
the element of sovereignty delegated to that department must, as in the case of 
the executive and legislative, reside, in its last and highest form, in one 
tribunal, one officer, or body of officers.
 
Williams v. Louisville & 
Nashville R.R., 58 
So. 315, 316 (Ala. 
1912).

[28] George D. Braden et al., The 
Constitution of the State of Texas: An Annotated and Comparative Analysis 
367 (1977).

[29] Citizens’ Commission on the 
Texas Judicial System, Report and Recommendations: Into the 
Twenty-First Century 3 (1993) [hereinafter Citizens’ Commission, Report and 
Recommendations].

[30] Texas Research League, Texas 
Courts: Report Two, The Texas Judiciary: A Proposal for Structural-Functional 
Reform, at iii, xi (1991) (emphasis 
omitted) [hereinafter “Texas Research 
League, Texas Courts: Report II”].

[31] Texas Research League, Texas 
Courts: Report I, at 
5.

[32] In re 
United Servs. Auto Ass’n, 307 S.W.3d 299, 302 
(Tex. 2010) (citations omitted).

[33] Texas Courts 
Online, Court Structure of Texas (Mar. 1, 2001), 
http://www.courts.state.tx.us/.

[34] Wallace B. 
Jefferson, The State of the Judiciary in Texas: Presented to the 80th 
Legislature by Chief Justice Wallace B. Jefferson (Feb. 20, 2007), in 70 
Tex. B.J. 314, 
316 (2007) [hereinafter “Jefferson, The State of the 
Judiciary”].

[35] Sultan v. 
Mathew, 178 S.W.3d 747, 753 (Tex. 2005) 
(Hecht, J., dissenting) (describing the jurisdictional system in a case 
regarding jurisdiction over claims originally filed in small claims 
court).

[36] Thomas M. 
Reavley, Court Improvement: The Texas Scene, 4 
Tex. Tech L. Rev. 269, 270 (1973) (citations 
omitted).

[37] Ed Kinkeade, Appellate Juvenile Justice in Texas: It’s a 
Crime! Or Should Be, 51 Baylor L. 
Rev. 17, 59 (1999) (explaining the jurisdictional overlap between Texas’s 
two courts of last resort as it applies to questions of juvenile 
appeals).

[38] Citizens’ Commission, Report 
and Recommendations 
17.

[39] H. Comm. on the Judiciary, To 
the Speaker and Members of the Texas House of Representatives, 72nd Legislature, 
71st Leg., R.S., at 8 (1990).

[40] In re 
United Servs., 307 S.W.3d at 303 (citations 
omitted).

[41] Id. 
at 303–04 (“[R]ecourse must be had first to the Constitution, second to the 
general statutes establishing jurisdiction for that level of court, third to the 
specific statute authorizing the establishment of the particular court in 
question, fourth to statutes creating other courts in the same county (whose 
jurisdictional provisions may affect the court in question), and fifth to 
statutes dealing with specific subject matters (such as the Family Code, which 
requires, for example, that judges who are lawyers hear appeals from actions by 
non-lawyer judges in juvenile cases).” (citation 
omitted)).

[42] Jefferson, 
The State of the Judiciary, at 316.

[43] See, e.g., 
Tex. Gov’t Code § 26.321 (“The County Court of Taylor County has the 
general jurisdiction of a probate court and juvenile jurisdiction as provided by 
Section 26.042(b) but has no other criminal or civil 
jurisdiction.”).

[44] Office of Court 
Administration, 2010 Annual Report for the Texas Judiciary 13 
(2010).

[45] Jose A. Berlanga and Diana P. Larson, Six is Not Enough: Why Six 
Person Juries in Concurrent Jurisdiction Cases in County Courts are Not 
Constitutional, 51 S. Tex. L. Rev. 
1, 1 (2009).

[46] Tex. Const. 
art. V, § 28.

[47] Tex. Gov’t Code 
§ 25.0009(a).

[48] See 
Sultan, 178 S.W.3d at 756 (Hecht, J., 
dissenting).

[49] See id. 
at 756 n.24.

[50] Tex. Gov’t Code § 25.0003(c)(1); see also In 
re United Servs., 307 S.W.3d at 303 (“Statutory 
county courts (of which county courts at law are one type) usually have 
jurisdictional limits of $100,000, unless, of course, they do not.”) (citations omitted).

[51] Sultan, 178 
S.W.3d at 756 (Hecht, J., dissenting).

[52] In re 
United Servs., 307 S.W.3d at 303 (citations 
omitted).

[53] See 
Worthen, The Organizational & 
Structural Development, at 63–64 (“Texas has the only intermediate appellate 
system in the nation with overlapping geographical appellate districts.”) (citation omitted).

[54] See 
Scott Brister, Is It Time to Reform 
Our Courts of Appeals?, 40 Hous. Law. 22, 25 (Mar.–Apr. 2003) 
(citations omitted) [hereinafter “Brister, Is It Time to 
Reform?”].

[55] Andrew T. 
Solomon, A Simple Prescription for Texas’s Ailing Court System: Stronger 
Stare Decisis, 37 St. Mary’s L. J. 417, 451–52 (2006) 
(citations omitted). In five of these counties, the appellant may choose to file 
an appeal in either intermediate court. Id. at 451, 
453. In the ten Houston-area counties, the intermediate court is randomly 
assigned. See id. at 451; Tex. Gov’t Code § 22.202(h).

[56] Miles v. Ford Motor Co., 914 S.W.2d 135, 139–40 (Tex. 
1995).

[57] See Montes 
v. City of Houston, 66 S.W.3d 267, 
267–68 (Tex. 2001) (Hecht, J., concurring).

[58] Compare 
Reyes v. City of Houston, 4 S.W.3d 459, 462 (Tex. App.—Houston [1st 
Dist.] 1999, pet. denied) with Montes v. City of Houston, 2000 WL 
1228618, at *4 n. 3 (Tex. App.—Houston [14th Dist.] 2000, pet. 
denied).

[59] Tex. Sup. 
Ct., Recommendations for Reallocation of Courts of Appeals, Misc. Docket 
No. 02-9232 (Dec. 17, 2002).

[60] See Tex. Gov’t Code § 74.022.

[61] David J. 
Schenck, Are We Finally Ready to Reshape Texas 
Appellate Courts for the 21st Century?, 41 Tex. Tech L. Rev. 221, 223 
(2009).

[62] Id. at 
222.

[63] Id. at 
225–26.

[64] Citizens’ 
Commission, Report and Recommendations 
11–12.
 

[65] Bretz 
v. State, 508 S.W.2d 97, 98 (Tex. Crim. 
App. 1974) (Roberts, J., concurring).

[66] State ex 
rel. Holmes v. Third Court of Appeals, 
885 S.W.2d 389, 418–419 (Tex. Crim. App. 1994) (Meyers, J., 
dissenting).

[67] Keith Carter, 
The Texas Court of Criminal Appeals, 11 
Tex. L. Rev. 455, 470 (1933) 
(“This lack of coordination extends throughout the courts. To the writer it 
seems clear that the existence of two independent ‘supreme courts’ can not be justified on either theoretical or practical 
grounds.”).

[68] Janet 
Elliott, State Appeals Twice in Sodomy Case, But Neither High Court May Want 
‘Hot Potato’, Tex. Lawyer, May 18, 1992, at 
1.

[69] State v. 
Morales, 869 S.W.2d 941, 948 n.16 (Tex. 1994).

[70] Id. at 
947.

[71] Editorial, 
Texas’ Top Courts Dodge Decision, San Antonio Express-News, Jan. 15, 
1994, at 40.

[72] See Brister, 
Is It Time to Reform?, at 26. Former Governor Bill Clements, 
who helped Chief Justice Greenhill promote giving criminal jurisdiction to the 
courts of appeals, once speculated that a majority of Texans “have no idea that 
we have a parallel system of courts, and the Supreme Court is, in fact, not 
supreme . . . . We can have a better court system, if 
we start right at the top and combine these two courts into one court.” See 
G. Robert Hillman, Clements Wants One Texas Supreme Court, Dallas Morning News, Mar. 18, 1987, at 1A.

[73] Texas Research League, Texas 
Courts: Report II, at 
25.

[74] Clarence A. 
Guittard, Court Reform, Texas Style, 21 Sw. L. J. 451, 451 (1967) [hereinafter 
“Guittard, Court Reform”].

[75] Dr. Roscoe 
Pound, Address Before the Thirty-Seventh Annual 
Proceedings of the Texas Bar Association, 37 Tex. Bar Ass’n 205–16 (1918) (J.A. Lord, 
rep.) [hereinafter “Lord, Tex. Bar. Ass’n”].

[76] Texas Research League, Texas 
Courts: Report I, at 
xvii.

[77] The Texas Bar 
Association saw an urgent need for judicial reorganization and responded by 
recommending an ambitious Article V overhaul. See Lord, Tex. Bar. Ass’n 69. Over the years, 
numerous distinguished lawyers and jurists pushed continually for system-wide 
reforms. See Guittard, Court Reform, 
at 453 (citing several calls for reform). In 1933, the Texas Civil Judicial 
Council, a longtime proponent of broadbased judicial 
reform, advocated a single, nine-member Supreme Court to handle both civil and 
criminal matters. Texas Judicial 
Council 1929–1997, at 63 (Aug. 31, 1997), reprinted from Texas Judicial Council 50th Annual Report 
60, 63 (1978). In 1941, then-Chief Justice Alexander exhorted the Council 
that “[w]e need a reorganization of our judicial system,” prompting the Council 
to propose a wholesale revision of Article V, which later died in a House 
subcommittee. Guittard, Court Reform, at 453–54 (citation omitted). In 1943, 
then-Dean of the University of Texas Law School, Charles McCormick, echoed the 
call for reform, including a single high court. Charles T. 
McCormick, Modernizing the Texas Judicial System, 21 Tex. L. Rev. 673, 695 (1943). A decade 
later, in the early 1950s, State Bar President Cecil Burney led another 
ill-fated effort to rewrite Article V, including judicial selection and 
high-court consolidation, proposals favored by a first referendum of state bar 
members but rejected by a second referendum. Guittard, 
Court Reform, at 454. In 1964, a conference sponsored by the state 
bar and the Joint Committee for the Effective Administration of Justice, derided 
our “unorganized and fragmented courts,” calling it “archaic” and calling for “a 
single and unified court system.” Lawyers, Laymen Urge Modernization of 
Texas’ Antiquated Judicial System, 27 Tex. B.J. 299, 305 
(1964).

[78] Texas Research League, Texas 
Courts: Report I, at 
66.

[79] See Tex. H.B. 
Nos. 1372–1376, 62nd Leg., R.S. (1971); Tex. H.R.J. Res. Nos. 77–80, 62nd Leg., 
R.S. (1971).

[80] Tex. H.R.J. Res. 61, 62nd Leg., R.S., 1971 Tex. Gen. 
Laws 4140.

[81] Task Force for Court 
Improvement, Proposed Judiciary Article of the Texas Constitution (1972) [hereinafter “Task Force: Proposed Judiciary 
Article”]. See also Greenhill, The Constitutional 
Amendment, at 379–80 (citations omitted).

[82] H. Comm. on the 
Judiciary, Streamlining the Texas Judiciary: Continuity 
with Change, 62nd Leg., R.S. (1972). This report prompted consideration 
in the 63rd Legislature, Regular Session of 1973 of Tex. H.B. Nos. 725, 1401–07, 
and 1600; Tex. H.R. Res. Nos. 48 and 96; and Tex. H.R. Con. Res. 129. See 
H. Comm. on the Judiciary, A 
Proposal, at 3 n.5.

[83] Greenhill, 
The Constitutional Amendment, at 383 (citation omitted). Chief Justice 
Calvert had also once served as Speaker of the Texas House of 
Representatives.

[84] Compare The Texas Constitutional Revision 
Commission: A New Constitution 
for Texas 109–22, with Task Force: Proposed Judiciary Article 
1–5.

[85] Texas State 
Historical Association, Constitutional Convention of 1974, Handbook of Texas Online, 
http://www.tshaonline.org/handbook/online/articles/mjc07 (last visited May 25, 
2011).

[86] Id.

[87] Id.

[88] See 
generally H. Comm. on the Judiciary, A 
Proposal.

[89] Greenhill, 
The Constitutional Amendment, at 384 (citations 
omitted).

[9][0] Id. at 
384–85.

[91] H. Comm. on the Judiciary, 
The Texas Court System: Manpower, Resources, and Management, 65th Leg., R.S., at 2–5 (1976).

[92] Citizens’ 
Commission, Report and Recommendations 4 
n.9.

[93] Joe R. 
Greenhill, State of the Judiciary: Address By the Texas 
Supreme Court Chief Justice to the 66th Texas Legislature (Jan. 31, 1979), 
in 42 Tex. B.J. 
379, 380 
(1979).

[94] Greenhill, 
The Constitutional Amendment, at 
396.

[95] Texas Research League, Texas 
Courts: Report I, 
at xvii.

[96] Citizens’ Commission, Report 
and Recommendations 3 
n.4.

[97] Id. at 
9–12.

[98] Texas Research League, Texas 
Courts: Report II, at 1. TRL’s earlier 
report in 1990 reached a similar conclusion: “Because the courts are so 
decentralized and because individually they are quite independent, it is 
difficult to call the Texas judiciary a system.” Texas Research League, Texas Courts: Report 
I, at xvii.

[99] Citizens’ Commission, Report 
and Recommendations 
47.

[100] Tex. Const. art. V, § 31.

[101] Citizens’ Commission, Report 
and Recommendations 
5.

[102] Id. at 
1. This two-courts-in-one proposal 
resembles one first proposed by Charles De Morse, a delegate at the Texas 
Constitutional Convention of 1875. Debates in the Texas Constitutional Convention 
of 1875, at 384–85 (Seth Shepard McKay ed., 
1930).

[103] Editorial, 
Texas Constitution: State should overhaul this outmoded relic, Dallas Morning News, Nov. 12, 1995, at 
2J.

[104] See 
Sultan, 178 S.W.3d at 753 (Hecht, J., 
dissenting); Jefferson, The State of the Judiciary, at 316.

[1][05] Editorial, Improve Texas justice by combining 
courts, Austin 
American-Statesman, Feb. 18, 2003, at A10.

[106] Tex. Const. art. V, § 3(a).

[107] Tex. Gov’t 
Code § 
22.002(e).

[108] See Ex 
parte Morris, 349 S.W.2d 99, 101 (Tex. 
1961) (orig. proceeding) (“[T]he statute limits our power in the language just 
stated, and we may inquire only into restraint brought about by an order or 
process of the court issued because of the violation of some order, judgment or 
decree in a civil case.”) (citation omitted); see also Ex parte Jackson, 
252 S.W. 149, 149–50 (Tex. 1923) (orig. proceeding) (“It is apparent that Judge 
Duncan [in his role as an attorney in another case] was held in contempt by the 
trial court, not for violating any order made by the court in a civil case, but 
because of certain language used in a brief filed in the case. From this 
statement it appears that, although the alleged contempt arose out of a civil 
case, yet, since it did not arise by reason of a violation of the court’s order, 
the Supreme Court declined to take jurisdiction. The Court of Criminal Appeals, as shown by the 
report of the case, did take jurisdiction, and discharged the relator.”). Ex parte Jackson was decided under a 
precursor to Section 22.002(e)—article 1529—which limited habeas jurisdiction to 
times when “any person is restrained in his liberty by virtue of any order, 
process or commitment, issued by any court or judge, on account of the violation 
of any order, judgment or decree theretofore made, rendered or entered by such 
court or judge in any civil cause.” 252 S.W. at 149. 
Ex parte Morris was decided under article 1737, a precursor to Section 
22.002(e) with the same wording as article 1529. 349 S.W.2d at 100; Act of Oct. 
7, 1895, 24th Leg., R.S., ch. 53, § 1, 1895 Tex. 
Gen. Laws 79 (amended 1905, 1909, 1927, 1933, 1941, 1943, 1963, 1981, 1983), 
repealed by Act of June 12, 1985, 69th Leg., R.S., ch. 480, § 26(1), 1985 Tex. Gen. Laws 1720, 
2050.
 

[109] See Ex 
parte Morris, 349 S.W.2d at 
101.

[110] The Court 
cites to a case in which this Court, without discussing the statutory limits of 
our habeas jurisdiction, upheld a contempt judgment against an attorney. __ 
S.W.3d __, __ (Tex. 2011); (citing Ex parte Fisher, 206 S.W.2d 1000 (Tex. 
1947) (per curiam) (orig. proceeding)). It also cites 
to a case in which this Court found it possessed jurisdiction without discussing 
whether the contemnor’s acts involved the violation of a court order. __ S.W.3d 
at __ (citing Ex parte Calhoun, 91 S.W.2d 1047, 1048–49 (Tex. 1936) 
(orig. proceeding)). But Ex parte Fisher did note that “[i]n a habeas corpus proceeding of this character this court 
has only limited powers.” 206 S.W.2d at 1003. And the 
Court in Ex parte Calhoun did not need to address whether a violation of 
a court order was involved since—as the Court notes—it did not find that there 
was restraint. 91 S.W.2d at 1048.

[111] See, 
e.g., Ex parte Allison, 90 S.W. 
870, 872 (Tex. 1906) (denying a habeas writ resulting from contempt for 
violation of an injunction); Ex parte Gonzalez, 238 S.W. 635, 636 (Tex. 
1922) (orig. proceeding) (granting habeas relief where contempt judgment was 
void because trial court lacked jurisdiction to find contemnor in 
contempt).

[112] See, 
e.g., Ex parte Reid, 89 S.W. 
956, 956 (Tex. 1905) (explaining the Supreme Court had no jurisdiction over a 
habeas petition where “[the] only contention is that the imprisonment is 
illegal”); Ex parte Jackson, 252 S.W. at 149 (“[W]e may inquire only into 
the restraint brought about by an order or process of the court issued because 
of the violation of some order, judgment, or decree in a civil 
case.”).

[113] In re 
Reece, No. WR-72,199-02, at 2.

[114] See 
Tex. S.J. Res. 36, 66th Leg., R.S., 
1979 Tex. Gen. Laws 3223. The 1980 amendments were adopted at the Nov. 4, 1980 
election, and became effective Sept. 1, 1981. See Tex. Const. art. V, 
§ 3.

[115] __ S.W.3d at __.

[116] __ S.W.3d at 
__ (emphasis added). The Court subsequently cites to Tex. Gov’t Code § 22.002(a) (permitting the Court to issue 
writs of mandamus “agreeable to the principles of law regulating those 
writs”). This Court should not issue mandamus where, as 
here, it is disagreeable to principles of law—those clearly stated in our 
statutory prohibition against hearing this case styled as 
habeas.

[117] Ex parte 
Morris, 349 S.W.2d at 101 (emphasis 
added).

[118] See 
__ S.W.3d at __ (“[W]e have also left 
open the possibility of circumstances ‘where the writ of habeas corpus would not 
be adequate and where mandamus would be the proper remedy.’”) (quoting Deramus v. 
Thornton, 333 S.W.2d 824, 827 (Tex. 1960) (orig. 
proceeding)).

[119] Deramus, 
333 S.W.2d at 827.

[120] Id.

[121] The opinion 
then goes on to note several then-recent decisions to that effect. Id. 
(citing Tims v. Tims, 204 S.W.2d 995 (Tex. Civ. App.—Amarillo 1947, writ 
ref’d); Wanger v. 
Warnasch, 295 S.W.2d 890 (Tex. 1956); Ex parte 
Arapis, 306 S.W.2d 884 (Tex. 
1957)).

[122] Deramus, 
333 S.W.2d at 827.

[123] Id.

[124] Id. at 830 
(Smith, J., dissenting) (citations omitted) (emphasis omitted).

[125] Deramus, 
333 S.W.2d at 827.

[126] 984 S.W.2d 
623 (Tex. 1999) (per curiam) (orig. 
proceeding).

[127] See In re 
Long, 984 S.W.2d at 625 (“Contempt 
orders that do not involve confinement cannot be reviewed by writ of habeas 
corpus, and the only possible relief is a writ of mandamus.”) (citing Rosser v. Squier, 902 
S.W.2d 962, 962 (Tex. 1995) (per curiam) (orig. 
proceeding)).

[128] __ S.W.3d at __.

[129] __ S.W.3d at __ (quoting In re Prudential, 148 
S.W.3d at 136) (quotation marks omitted).

[130] See, 
e.g., In re Watkins, 279 S.W.3d 
633, 634 (Tex. 2009) (Noting as dispositive whether “granting mandamus to 
review . . . would subvert the Legislature’s limit on such 
review.”); Teat v. McGaughey, 22 S.W. 302, 303 
(Tex. 1893) (“The bill of right secures the right of trial by jury, and, while 
the people doubtless could amend the constitution so as to modify or limit the 
right, we do not think any modification was intended by the provision in the 
late amendments which authorized the legislature to confer jurisdiction upon 
this court to issue the writ of mandamus in certain specified 
cases.”).

[131] See, 
e.g., In re AIU Ins. Co., 148 
S.W.3d 109, 110 (Tex. 2004) (granting mandamus in the arbitration context); 
In re CSX Corp., 124 S.W.3d 149, 151 (Tex. 2003) (per curiam) (granting mandamus in the discovery context); In 
re Ford Motor Co., 165 S.W.3d 315, 322 (Tex. 2005) (per curiam) (granting mandamus in the legislative-continuance 
context).

[132] 73 S.W. 4 (1903).

[133] Id. at 
5.

[134] Act of Apr. 
13, 1892, 22nd Leg., C.S., ch. 14, § 1, art. 1012, 
1892 Tex. Gen. Laws 19, 21, repealed by Act of May 12, 1939, 46th Leg., 
R.S., ch. 25, § 1, 1939 Tex. Gen. Laws 
201.

[135] Betts, 73 S.W. 
at 5 (“But the writ applied for in this case is against a board of officers, and 
not against an officer. It seems that, if it had been the purpose to empower 
this court to issue the writ as well against a board of officers as against a 
single officer, the language would have been, ‘any officer or board of officers 
of the state government.’”).

[136] See In re 
TXU Elec. Co., 67 S.W.3d 130, 136 (Tex. 2001) (per curiam) (Baker, J., concurring) (“Because I believe this 
Court does not have jurisdiction to mandamus a state board or commission, I can 
only concur in the Court's judgment that TXU is not entitled to mandamus 
relief.”).

[137] “The rule 
is, of course, an elementary one that mandamus will not lie to an inferior court 
where proceedings therein have been enjoined.” Sterling v. Ferguson, 53 
S.W.2d 753, 757 (Tex. 1932) (quotation marks and citations omitted); 2 Thomas Carl Spelling, Extraordinary 
Relief § 1402, at 1159 (1893) (“It is a familiar principle that 
mandamus does not lie to compel a party to violate an injunction; and the 
principle is as applicable where the writ is sought in a superior court as in 
other cases.”).

[138] “[M]andamus cannot issue to compel a public officer to do an act 
which is not clearly prescribed by law.” Horton v. Pace, 9 Tex. 81, 84 
(Tex. 1852) (citations omitted) (emphasis omitted).

[139] See 
Kidder v. Hall, 251 S.W. 497, 498 (Tex. 
1923) (citing to various statutes and concluding that mandamus could not issue 
in part because “[f]rom a consideration of all the 
articles named,” jurisdiction fell within the district court, and therefore this 
Court had no jurisdiction).

[140]
See 984 S.W.2d 
at 625.

[141] __ S.W.3d at __.

[142] 842 S.W.2d 
266 (Tex. 1992) (orig. proceeding).

[143] Id. at 
273.

[144] Id. at 
272.

[145] Id. (“Although 
we can conceive of no benefit from such an unnecessarily expensive and 
cumbersome rule, we may not enlarge appellate jurisdiction absent legislative 
mandate.”).

[146] In re D. 
Wilson Constr. Co., 196 S.W.3d 774, 780 
n.4 (Tex. 2006) (“While we continue to see no benefit in requiring parties to 
pursue parallel proceedings that are ‘unnecessarily expensive and cumbersome,’ 
we remain mindful that ‘we may not enlarge appellate jurisdiction absent 
legislative mandate.’”) (quoting Jack B. Anglin Co., 842 S.W.2d at 272).

[147] Jack B. 
Anglin Co., 
842 S.W.2d at 272.

[148] __S.W.3d at __.

[149] See, 
e.g., Fariss v. Tipps, 463 S.W.2d 176, 180 (Tex. 
1971) (orig. proceeding); Lawrence v. State, 412 S.W.2d 40, 40 
(Tex. 1967) (per curiam) (orig. proceeding); Wilson 
v. Bowman, 381 S.W.2d 320, 321 (Tex. 1964) (orig. proceeding); Cooper v. 
State, 400 S.W.2d 890, 890–92 (Tex. 1966) (orig. proceeding). While it is 
true, as the Court points out, that the Court “occasionally entertained” these 
petitions, __ S.W.3d at __, it ultimately issued mandamus in only one of these 
four cases. See Fariss, 463 
S.W.2d at 177.

[150] See 
Tex. Const. 
art. V, § 5 
(amended 1977 and 1980); Thomas v. Stevenson, 561 S.W.2d 845, 847 (Tex. 
Crim. App. 1978) (en banc).

[151] See 
Tex. Civ. 
Prac. & Rem. Code § 51.016 (enacting a 
law authorizing interlocutory appeals under the FAA in Texas courts); Tex. S. J. 
Res. 18, 65th Leg., R.S., 1977 Tex. Gen. Laws 3359 (amending the Constitution to 
provide the Court of Criminal Appeals with mandamus jurisdiction over all 
criminal law matters).

[152] __ S.W.3d at 
__ (citing Ex parte Duncan, 182 S.W. 313, 313 (Tex. Crim. App. 1916)). It 
also cites to a case in which the Court of Criminal Appeals simply noted that it 
will not act until we determine whether we have habeas jurisdiction. Id. 
(citing Ex parte Cvengros, 384 S.W.2d 881, 
882 (Tex. Crim. App. 1965)). That seems to be what has happened here, and we 
should rule that we do not have jurisdiction.

[153] Entergy Gulf States, Inc. v. 
Summers, 282 S.W.3d 
433, 475 (Tex. 2009) (Willett, J., concurring) (footnote omitted). See also, 
e.g., Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d 644, 652 n.4 (Tex. 
2006) (“[W]e are mindful that over-reliance 
on secondary materials should be avoided, particularly where a statute’s 
language is clear. If the text is unambiguous, we must take the Legislature at 
its word and not rummage around in legislative minutiae.”); Summers, 282 
S.W.3d at 475 (Willett, J., concurring) (“Laws exist to guide behavior, and by 
resting on statutory language rather than embarking on a scavenger hunt for 
extratextual clues prone to contrivance, we ensure 
that everyday Texans struggling to decode the law and 
manage their affairs consistent with it can rely on a statute ‘to mean what it 
says,’ without having to hire lawyers to scour the legislative record for 
unexpressed (and often contradictory) indicia of intent.”) (footnotes and 
citations omitted); AIC Mgmt. v. Crews, 246 S.W.3d 640, 650 (Tex. 2008) 
(Willett, J., concurring) (“The 
statute itself is what constitutes the law; it alone represents the 
Legislature’s singular will, and it is perilous to equate an isolated remark or 
opinion with an authoritative, watertight index of the collective wishes of 181 
individual legislators, who may have 181 different motives and reasons for 
voting the way they do.”) (footnote omitted); Ben 
Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. 
Fund, 212 S.W.3d 320, 330 n.1 (Tex. 2006) (Willett, J., concurring in 
part and dissenting in part) (“These dueling snippets of legislative history illustrate the peril of placing undue reliance on 
secondary materials. Anyone looking for a preferred interpretation can usually 
find a ready ally lurking in the legislative record, even if the statute’s 
literal text points the opposite direction. I do not reject out of hand the 
principled use of legislative history to unearth reliable guidance (unless the text’s 
plain language is unequivocal), but it certainly merits a jurisprudential grain 
of salt. The enacted, voted-on text is what constitutes the law.”) (citation omitted).
 

[154] __ S.W.3d at 
__ (emphasis added).

[155] __ S.W.3d at 
__ (emphasis added).

[156] __ S.W.3d at __.

[157] In re 
Reece, No. WR-72,199-02, at 2 
(“Although this Court does have the authority to act in this case pursuant to 
Article 5, § 5, of the Texas Constitution, we decline to do 
so.”).

[158] __ S.W.3d at __.

[159] __ S.W.3d at __.

[160] That the 
strange Texas jurisdictional system offers Reece a remedy via the Court of 
Criminal Appeals easily disposes of his reliance on a United States Supreme 
Court case for the notion that this scenario is “of such a character as to be an 
exception to the rule of procedure that other available sources of judicial 
power may not be passed by for the purpose of obtaining relief by resort to the 
original jurisdiction of this court.” Ex parte Hudgings, 249 U.S. 378, 379 
(1919).

[161] __ S.W.3d at __.

[162] __ S.W.3d at __.

[163] See id. 
at __ (“[S]everal courts of 
appeals have presumed mandamus is limited to the review of fine-only contempt 
orders, but not orders that result in confinement.”) (citations omitted).

[164] See, 
e.g., In re M.J., 227 S.W.3d 786, 793 
(Tex. App.—Dallas 2006, pet. denied [mand. denied]) 
(“Contempt orders involving confinement must be challenged by writ of habeas 
corpus.”); Cadle Co. v. Lobingier, 50 S.W.3d 662, 671 (Tex. App.—Fort Worth 
2001, pet. denied) (en banc) (“A contempt judgment is reviewable only via a 
petition for writ of habeas corpus (if the contemnor is confined) or a petition 
for writ of mandamus (if no confinement is involved).”); In re Zenergy, Inc., 968 S.W.2d 1, 12 (Tex. App.—Corpus 
Christi 1997, orig. proceeding) (reasoning that because the contempt judgment in 
the case involved confinement, mandamus relief was improper, and any relief 
“will come through habeas corpus review.”).

[165] __ S.W.3d at __ (citation 
omitted).

[166] In re 
Reece, No. WR-72,199-02, at 2 
(“Effective 1981, Article 5, § 3(a), of the Texas Constitution was amended to 
give the Texas Supreme Court and the Justices thereof the authority to issue 
writs of habeas corpus.”). The Court does not acknowledge this 
mistake.

[167] __ S.W.3d at __.

[168] Ex parte 
Hofmayer, 420 
S.W.2d 137, 138 (Tex. 1967) (orig. proceeding).

[169] __ S.W.3d at __ (citation 
omitted).

[170] __ S.W.3d at 
__ (citations omitted).

[171] Sultan, 178 
S.W.3d at 753 (Hecht, J., dissenting).

[172] State v. 
Briggs, 351 S.W.2d 892, 894 (Tex. Crim. 
App. 1961).

[173] In re 
Reece, No. WR-72,199-02, at 2 
(“Although this Court does have the authority to act in this case pursuant to 
Article 5, § 5, of the Texas Constitution, we decline to do 
so.”).
                                                             
APPENDIX